FILED
06/20/16
Christy Blakemore
Circuit Clerk
Boone County Missouri

**IN THE CIRCUIT COURT OF BOONE COUNTY, MISSOURI**

Melissa A. Maras, )
                        Plaintiff, )
 )
v. )      **Case No. 16BA-CV00694**
 )
The Curators of the University )      **JURY TRIAL DEMAND**
of Missouri, )
 )
and )
 )
Daniel L. Clay, Keith Herman, )
Matthew P. Martens, Timothy C. Riley-Tillman, )
and R. Bowen Loftin, )
      in their individual and official capacities, )
                   Defendants. )

## PLAINTIFF'S FIRST AMENDED PETITION FOR DAMAGES

COMES NOW, Plaintiff Melissa A. Maras, by and through counsel, Johnston & Smith, LLC, and for her First Amended Petition for Damages against Defendants states:

1.     Plaintiff, Melissa A. Maras, is a United States citizen, and a resident of Boone County, Missouri. She has been continuously employed, full-time, by the Curators of the University of Missouri, University of Missouri-Columbia in the College of Education—as Assistant Professor in the Department of Educational, School, and Counseling Psychology or Associate Director of Research, Hook Center for Educational Renewal, —since August 25, 2008. She presently resides at ██████████████████████████

2.     Under Missouri Revised Statutes §§ 172.010 et seq. (2004) and pursuant to §§ 9(a) and 9(b) of article IX of the Missouri Constitution, the University of Missouri, an institution of higher education, was incorporated and created as a body politic to be known by the name "The Curators of the University of Missouri" (hereinafter the "Curators"). The University maintains and operates a campus in the City of Columbia, Boone County, Missouri

EXHIBIT B

where Plaintiff worked and was employed at all times relevant herein. The University has been recognized as a state agency. *Krasney v. Curators of Univ. of Mo.*, 765 S.W.2d 646, 649 (Mo. App. W.D. 1989). Specifically, the Board is "a public corporation for educational purposes" and an "agency or arm of the State." *Todd v. Curators of the Univ. of Mo.*, 147 S.W.2d 1063, 1064 (Mo. 1941). Defendant Curators may be served in care of Stephen J. Owens, Office of General Counsel, 227 University Hall, Columbia, MO, 65211.

3.     Defendant Matthew P. Martens, Divisional Executive Director, Department of Educational, School, and Counseling Psychology in the College of Education at the University of Missouri, is and at all times relevant herein has been, an employee of the University with administrative duties affecting Plaintiff's employment, faculty and civil rights at the University of Missouri. He may be served at: 303k Townsend Hall, University of Missouri, Columbia, MO 65211.

4.     Defendant Daniel L. Clay, Dean of the College of Education at the University of Missouri, is and at all times relevant herein has been, an employee of the University with administrative duties affecting Plaintiff's employment, faculty and civil rights at the University of Missouri. He may be served at 108 Missouri Innovation Center, University of Missouri, Columbia, MO 65211.

5.     Defendant Timothy C. Riley-Tillman, Associate Division Director, Department of Educational, School, and Counseling Psychology in the College of Education at the University of Missouri, is and at all times relevant herein has been, an employee of the University with administrative duties affecting Plaintiff's employment, faculty and civil rights at the University of Missouri. He may be served at 16 Hill Hall, University of Missouri, Columbia, MO, 65211.

6. Defendant Keith Herman, Chair Academic Personnel Committee, Department of Educational, School, and Counseling Psychology in the College of Education at the University of Missouri, is and at all times relevant herein has been, an employee of the University with administrative duties affecting Plaintiff's employment, faculty and civil rights at the University of Missouri. He may be served at 5 Hill Hall, University of Missouri, Columbia, MO, 65211.

7. Defendant R. Bowen Loftin, former Chancellor at the University of Missouri, was at all times relevant herein an employee of the University with administrative duties affecting Plaintiff's employment, faculty and civil rights at the University of Missouri. He may be served at 105 Jesse Hall, University of Missouri, Columbia, MO, 65211.

8. This Court has personal jurisdiction over Defendants pursuant to Rule 54.07(a)(1) of the Missouri Supreme Court Rules because the cause of action as stated in this petition arose in Boone County.

9. Count I in this action is brought pursuant to the Missouri Human Rights Act ("MHRA"), §213.055(a) RSMo., which provides that it shall be an unlawful employment practice: for an employer, because of race, color, religion, national origin, sex, ancestry, age, or disability of any individual to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability.

10. Count I in this action is also brought pursuant to MHRA, § 213.070(2) RSMo., which provides that it shall be an unlawful discriminatory practice to retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated

in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter.

11.    Count III in the action is brought pursuant to Title VII of the Civil Rights Act of 1964, as mended, 42 U.S.C. 2000e, et seq. against defendant The Curators of the University of Missouri.

12.    At all relevant times hereto, Defendant Curators did and does now employ more than six employees within Missouri and is therefore an "employer" under § 213.010(7), R.S.Mo.

13.    On May 7, 2008, Plaintiff was extended an offer of employment as an Assistant Professor, Tenure Track, in the Department of Educational, School, and Counseling Psychology in the College of Education at the University of Missouri.  Her offer letter represented that her appointment was subject to all rules, orders and regulations of the Board of Curators. (A copy of Plaintiff's offer letter, attached as Exhibit A to the original petition, is incorporated by reference herein.)

14.    Plaintiff accepted Defendants' offer and her employment began on August 18, 2008 with a tenure start date of September 1, 2008.

15.    Thereafter, for three (3) consecutive years, she was reappointed each year for advancement towards an award of promotion to Associate Professor with tenure despite not receiving any annual performance review letter from the ESCP Academic Personnel Committee in academic years 2008/2009 and 2009/2010 and in direct violation of the department's P&T guidelines (ESCP Guidelines and Standard for Faculty Review, III: C, D, & E).

16.    On or about May 13, 2010, Plaintiff's third-year review was conducted and she was informed that by a <u>unanimous vote</u> she had successfully completed her third-year review per the guidelines prescribed in the Department's Guidelines and Standards for Faculty Review

Electronically Filed - Boone - June 07, 2016 - 02:15 PM

for Promotion and Tenure to Associate Professor. (A copy of her Third Year Review evaluation, attached as Exhibit B to the original petition, is incorporated by reference herein.)

17.     On or about May 15, 2012, Plaintiff's fourth-year review was conducted and she was informed that by unanimous vote she successfully completed her fourth year. This letter described specific goals for productivity for Plaintiff in anticipation of Plaintiff's tenure review during the 2013/2014 academic year. Plaintiff met and exceeded all goals set forth in that letter.

18.     Thereafter, Plaintiff requested and was granted one annual extension of her tenure probationary period due to her pregnancy and parental leave in academic years 2012/2013 (November 2012 – February 2013).

19.     In June/July 2012, Plaintiff announced her 1st pregnancy and began the process to request an extension of her tenure probationary period.  Her child was born in ████████

████

20.     In May 2013, a 5th year review was conducted but no vote and no specific recommendation of reappointment was made.  Upon knowledge and belief, there was disagreement during the review committee meeting about whether or not Plaintiff should have been reviewed.

21.     Plaintiff was reviewed under an inapplicable review policy.  She received a favorable review but there were clear differences between this annual review letter and previous review letters.

22.     In May 2014, a 6th year review was conducted and the vote of the department's personnel committee was 7 yes, 2 no, 1 abstention for reappointment.

23.     In Summer 2014, Plaintiff announced her 2nd pregnancy to all members of her department.

24.     On or about July 15, 2014, Plaintiff complied with all instructions and guidelines in the Provost's Promotion and Tenure Call for completing and submitting her promotion and tenure call documents and forms.

25.     In August 2014, Plaintiff was reviewed by her department P&T committee.

26.     In ███████, Plaintiff's 2nd child was born.

27.     The Department's Guidelines for Promotion and Tenure to Associate Professor provide the following criteria for promotion to Associate Professor with tenure, to wit:

> "Associate Professor with Tenure: Has begun to establish a national reputation as a scholar; has published 10 to 12 high quality publications from section VI, B, 1 (predominantly from category A) that establish an empirical and programmatic line of research ; has attended and presented on average at one national conference each year; has made a substantial effort to obtain a funded grant/contract that furthers the faculty's research agenda and supports the mission of the department and college; has provided a wide range of evidence indicative of effective teaching and has made satisfactory contributions to service in the Department, College, Campus, and/or University."

Standards for research performance continue on p. 8 and Plaintiff exceeded all expectations and standards for research performance.  (A copy of the Department's Guidelines for Promotion and Tenure to Associate Professor, attached as Exhibit C to the original petition, is incorporated by reference herein)

28.     The Department's Guidelines for Promotion and Tenure to Associate Professor also provide Standards of Performance for Promotion and Tenure in teaching, research and service.

29.     Plaintiff successfully met all criteria and standards of the Department of Educational, School and Counseling Psychology for Promotion to Associate Professor with Tenure.

30.     Plaintiff was not told she would be evaluated on criteria not stated in her department's P&T guidelines.  ESCP P&T guidelines changed the semester Plaintiff had her

first child. Defendants Martens and Riley-Tillman led that work. All the tenure-track faculty in the dept at that time (5 total) voiced concerns about changes to the criteria and the lack of specificity. Those concerns were ignored. Defendant Martens informed the faculty that he had consulted campus leadership and was told that the department could change its P&T criteria if they didn't disadvantage the candidaates. His proposed changes were voted in early Fall 2012 (right before Plaintiff's first child was born). It wasn't until January 2013 while Plaintiff was still on parental leave that the faculty voted and agreed that junior tenure-track faculty could choose to be evaluated under the new or the old policy. Plaintiff was evaluated under the new policy for 5th year review (her first negative-ish review) even though she had not been asked or assented to be reviewed under the new policy.

31. Plaintiff had a valid expectancy that her continued employment with Defendant Curators and her promotion to Associate Professor and an award of tenure would be based on the Collected Rules and Regulations, and on the customs, practices, or *de facto* policies promulgated by Defendant Curators, the College of Education and the Department of Educational, School, and Counseling Psychology.

32. Defendant Curators' Collected Rules and Regulations represent to its employees that it actively seeks and employs qualified persons in all job classifications and administers all personnel actions affecting employees without discrimination on the basis of race, color, sex, age, marital status, national origin, disability, veteran status, pregnancy, or any other basis prohibited by law.

33. Defendant Curators' Collected Rules and Regulations and Human Resources Policy Manual represented to its Faculty that it does not discriminate on the basis of sex (gender) or on any basis not related to a Faculty Member's demonstrated ability and

competence. Defendant Curators represented to Plaintiff that it emphasizes the dignity and inherent worth of its employees and that it adheres to a strict non-discrimination policy regarding the treatment of Faculty. Section 320.010(A) of the Collected Rules and Regulations expressly states Defendant Curators's Equal Employment Opportunity Program, to wit: "Equal Opportunity is and shall be provided for all employees and applicants for employment on the basis of their demonstrated ability and competence without discrimination on the basis of their race, color, religion, sex, sexual orientation, national origin, age, disability, or status as a Vietnam era veteran."

34. Chapter 310.015.A of Defendant Curators's Academic Tenure Regulations provides, inter alia, to wit: The performance of all non-regular and untenured regular faculty is to be reviewed annually by the appropriate unit supervisor (e.g., department chair, dean, director, etc.). The review should cover the performance for the past year and plans for the coming year. Written evaluations are expected and must be provided to non-regular faculty members where there are concerns about substantial shortcomings in performance.

35. Chapter 320.035 of Defendant Curators's Collected Rules and Regulations prescribes Defendant Curators's procedures for Promotion and Tenure.

36. Chapter 320.035.A.4.a provides, to wit: "In the promotion and continuous appointment process, the final decisions are made by the chancellor."

37. Chapter 320.035.B.1 provides, inter alia, to wit: "While specific criteria for judging the merits of individual faculty may vary among units, there must be no variation in standards. The University will continue to strengthen its standards in all disciplines. Satisfaction of minimum criteria at the college, school, or department levels is not sufficient to insure promotion or continuous appointment. The University seeks faculty members who are

8

genuinely creative scholars and inspired teachers and who are dedicated to the pursuit of knowledge and its transmission to others. These high standards are to be observed in the recruitment, promotion, and tenuring of faculty members. All persons and committees making recommendations regarding promotion and tenure will consider the candidate's demonstrated ability to meet these standards. Outstanding intellectual qualities as reflected in teaching and scholarship are the primary criteria for recommendation for promotion and tenure. Additional criteria include professionally-oriented, service contributions and service to a faculty member's department, school, college, and the University."

38.     Chapter 310.020 provides, inter alia, to wit: "Consideration for award of continuous appointment and promotion to the rank of associate professor normally occurs after a probationary period not to exceed six years, as described in the Academic Tenure Regulations."

39.     Chapter 310.025 Extension of Probationary Period for Faculty on Regular Term Appointment, provides, inter alia, "extension of a faculty member's probationary period shall have no adverse effect on the tenure decision."

40.     The instructions and guidelines for promotion and tenure are available to faculty on a website maintained by the Office of the Provost of the University of Missouri – Columbia at http://provost.missouri.edu/faculty/tenure.html.

41.     The instructions and guidelines referenced in paragraph 39 include the "AAUP Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments." These AAUP guidelines have been adopted by Defendant Curators.

42.     The AAUP Statement on Procedural Standards item number 4. "Written Reasons" provides, inter alia, to wit: "If the faculty member succeeds in establishing a prima

9

facie case, it is incumbent upon those who made the decision against reappointment to come forward with evidence in support of their decision. Statistical evidence of improper discrimination may be used in establishing a prima facie case."

43.     Although Defendant Curators' Collected Rule and Regulation 370.010.B.2 provides, inter alia, that a faculty member who has been terminated from his or her tenure-track faculty position may file a grievance on the basis of unlawful discrimination after unsuccessful appeals to the Chancellor, it does not require Plaintiff to file a grievance prior to seeking a judicial remedy.

44.     Chapter 370.010.C.5.b.iii provides, to wit: "The GRP [Grievance Review Panel] may terminate a grievance if a lawsuit related to the substantive content of the grievance, as determined by the GRP, is initiated at any time.  The grievant and the respondent are immediately released from requirements imposed by Section 370.010.C.12.  This action is not appealable."

45.     Upon knowledge and belief, the GRP always terminates any grievance upon learning that a lawsuit related to the substantive content of the grievance was filed.

46.     Upon knowledge and belief, Defendant Loftin acts either individually in his capacity as Chancellor, or in concert with the others, such as the other named Defendants in Maras' application, to make all final decisions on applications for promotion and tenure.

47.     Upon further knowledge and belief, Defendant Loftin has not issued any decision in any appeal of a department chair's, Dean's or Provost's recommendation for denial, or his denial of the applicant's application for promotion and tenure that was favorable to the applicant.

48.     On or about November 2015, Defendant Loftin resigned as Chancellor, in part

due to a letter from nine (9) deans on the University of Missouri – Columbia campus to Defendant Curators' Board stating that Defendant Loftin created a "toxic environment through threat, fear and intimidation."

49.     The College of Education ("COE") is comprised of five (5) academic departments; one of which is the Department of Educational, School, and Counseling Psychology.

50.     On or about November 29, 2015, which is within 180 days of the unlawful and discriminatory acts about which Plaintiff complains, Plaintiff filed with the Missouri Commission on Human Rights ("MCHR") charges of gender discrimination under the MHRA against Defendants. (A copy of said Complaint of Discrimination, which is incorporated by reference herein, is attached as Exhibit D.)

51.     On January 28, 2016, the MCHR issued Plaintiff a Notice of Right to Sue letter. (A copy of said letter, attached as Exhibit E to the original petition, is incorporated by reference herein.)

52.     On May 13, 2016, Plaintiff was mailed a "Notice of Right to Sue" letter from the U.S. Department of Justice stating, inter alia, that Plaintiff has the right to initiate a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, against the above named respondents (The Curators of the University of Missouri, et al.) and the lawsuit must be filed within ninety (90) days of his receipt of this notice. (A copy of the Notice of Right to Sue letter, which is incorporated by reference herein, is attached as Exhibit P)

53.     This action is commenced within 90 days of the issuance and receipt of the Notice of Right to Sue letters from MCHR and EEOC.

54.     Plaintiff has, therefore, satisfied all administrative and judicial prerequisites to the institution of her MHRA and Title VII claims.

## COUNT I: VIOLATION OF THE MISSOURI HUMAN RIGHTS ACT
### (§§ 213.055, 213.070, R.S.Mo.)
### (as to all Defendants)

55.     Plaintiff herein incorporates by reference the allegations contained in paragraphs 1 through 54 of her Petition for Damages.

### *I. Disparate Treatment on the Basis of Sex*

56.     At all times relevant herein, Plaintiff was a Caucasian 35-year-old female who is a member of a protected class under the aforementioned statute on the basis of her sex.

57.     Plaintiff was qualified to perform the job she was performing in Defendants' employ.

58.     As described more fully in paragraph 61, *infra*, Plaintiff was subjected to adverse employment actions during her employment with Defendants; the principal adverse employment actions Plaintiff was subjected to during her employment with Defendants was the failure to recommend promotion and tenure resulting in the denial of her application for promotion and tenure.

59.     Plaintiff's protected status as a female was a contributing factor in the adverse actions taken against her by Defendants and described more fully *infra* in paragraph 61.

60.     Defendants had no legitimate, non-discriminatory, and credible explanation for its denial of Plaintiff's application for promotion and tenure.

61.     Defendants, acting either individually or in concert with the other named Defendants, subjected Plaintiff to a hostile and offensive work environment and discrimination, based on her sex (i.e. gender, pregnancy and childbirth), which she found and which a

reasonable person would find to be offensive, and which altered the terms and conditions of her

employment.  These actions include:

a)      Leadership in the COE  (currently and at time of conversation) advised the

Plaintiff not to disclose her pregnancy to her Candidate Committee (comprised of 3 tenured

ESCP faculty) or ESCP Academic Personnel Committee (comprised of tenured ESCP

faculty; herein referred to as 'ESCP Committee') prior to her annual review (4th year).

Defendants Riley-Tillman (chair) and Herman were members of Plaintiff's Candidate

Committee and ESCP Committee. Defendant Martens was a member of Plaintiff's ESCP

Committee (April 2012)

b)      In an e-mail dated 8/3/2012, ESCP Associate Division Director and Division

Executive Director (at time of exchange)  advised Plaintiff that university-approved

extensions of the probationary period are "rarely granted" without "compelling reasons" and

that he was not sure if "maternity qualifies." MU automatically grants university-approved

extensions of the probationary period for reasons of pregnancy (i.e., allowing faculty to

"stop the clock" on progress towards tenure). To date, Plaintiff is the only person known to

have been granted a university-approved extension of the probationary period in the COE

(August 2012).

c)      Plaintiff received no guidance from her committee, department, division, or

college leadership regarding if/when/how her performance and annual progress would be

evaluated upon her return from her parental leave and following receipt of university

approved extension of the probationary period in violation of the University's CRR

Guidelines for Requesting Extensions of the Tenure Probationary Period (Fall 2012).

d) Members of Plaintiff's Candidate Committee did not respond to e-mail sent by Plaintiff prior to annual review (5th year) that requested assistance/guidance about policies and procedures for evaluation following parental leave and during university-approved extension of the probationary period. Defendants Riley-Tillman (chair) and Herman were members of her Candidate Committee. Defendant Martens was ESCP Associate Division Director (April 2013).

e) Members of ESCP Committee disclosed to Plaintiff that during her annual review (5th year), that the ESCP Committee collectively discussed their uncertainty about policies and procedures for evaluating Plaintiff following parental leave and during university-approved extension of probationary period. Committee went on to evaluate Plaintiff despite this uncertainty, also choosing to evaluate Plaintiff using a significantly revised ESCP P&T policy that was neither the policy in place at the time of Plaintiff's hire nor the policy the Plaintiff wish to be evaluated under (both violations of ESCP P&T Policy). (May 2013).

f) Upon transitioning to new leadership positions, Defendants Riley-Tillman and Martens failed to appoint new Candidate Committee Chair for Plaintiff (Defendant Riley-Tillman was prior chair), leaving this role vacant for six months in the year proceeding Plaintiff's parental leave and preceding Plaintiff's tenure review during which materials for external review and the dossier are typically prepared (August 2013 – January 2014).

g) Defendant Riley-Tillman approached Plaintiff, telling her he "couldn't sleep" after learning it might not be possible for Plaintiff to convert Tenure-Track (TT) faculty position to Non-Tenure-Track (NTT) faculty position if Plaintiff was denied tenure, indicating that other leadership in the COE was investigating that possibility. Defendant

Riley-Tillman encouraged the Plaintiff to consider converting to an NTT position, suggesting the Plaintiff would likely make more money long-term in an NTT position and "wouldn't have to do any of this research stuff" in that role (September 2013).

h)     Defendant Riley-Tillman ignored Plaintiff's requests to be assigned a faculty mentor as part of new ESCP Mentoring Program geared towards junior faculty. Following Plaintiff's complaint during tenure review process, Plaintiff was assigned mentor in October 2014 (10 months following initial request and 3 months after tenure review process commenced). (January/February 2014).

i)     Plaintiff's Candidate Committee did not respond to requests for assistance/guidance about policies and procedures for evaluation during annual review (6th year). Defendant Herman chaired Plaintiff's Candidate Committee. Defendants Riley-Tillman, Martens, and Clay were in leadership positions in the COE (April 2014).

j)     During discussion of annual performance review, Defendant Riley-Tillman (as Associate Division Director) suggested Plaintiff's tenure review would be "interesting" and said to Plaintiff: "if you do get tenure, we'll find something useful for you to do" (May 2014).

k)     During discussion with member of COE staff on the same day of appeal meeting with Defendant Clay, Defendant Riley-Tillman suggested of Plaintiff: "She's done. She should have taken the NTT position when she had the chance. That role is perfect for someone who just wants to do student service stuff like her. But she put up a good fight and hasn't been too aggressive." Plaintiff later met with Senior COE Leadership regarding these comments. Plaintiff was advised of various options Plaintiff could pursue, including filing a

complaint with the Title IX Office, but was encouraged to wait until a permanent director

was installed in that office "next year" (December 2014).

l)      Upon recommendation by Defendant Riley-Tillman, all-day faculty retreat for

academic program "re-visioning" postponed from mid-January until after Plaintiff's parental

leave with second child was scheduled to begin. During retreat academic program faculty

(which included Defendants Riley-Tillman and Herman) made significant changes to

Plaintiff's teaching duties (which comprised 40% of her effort in TT position) such that

Plaintiff would no longer teacher courses she had taught annually or each semester since her

appointment at MU. Changes were not communicated to Plaintiff until June 2015, at which

time she had no formalized teaching responsibilities in her academic program for the 2015-

2016 academic year (January-June 2015).

m)      Plaintiff  hired as Associate Director of Research in the COE Hook Center for

Educational Renewal after receiving a large grant (as co-PI) and subcontract (as PI). During

a meeting with COE senior leadership and two COE staff, Defendant Martens speaks to this

new role: "There is no affiliation. That's a made-up position." Plaintiff received unanimous

vote of approval from Campus P&T Committee in mid-April (April/May 2015).

n)      Defendant Martens issued a vague threat toward Plaintiff via e-mail about

problems processing a large subcontract awarded to Plaintiff. Negative and dismissive tone

continued during impromptu meeting with Defendants Martens and Riley-Tillman and

Senior COE Leadership about Plaintiff's subcontract. During meeting plaintiff addressed

Defendant Martens' e-mail threat by saying it made her uncomfortable, to which Defendant

Martens laughed (May 2015).

o)      Provost Garnett Stokes refered Plaintiff to Title IX office following appeal meeting with Plaintiff during which Plaintiff outlined discussion she had experienced and concerns about retaliation by Defendants Martens and Riley-Tillman following unanimous positive recommendation by Campus Promotion and Tenure Committee. Plaintiff first raised concerns about gender-based discriminatory actions 10 months prior during her appeal to ESCP Academic Personnel Committee. Thus, none of the approximately thirty-five tenured faculty—including multiple departmental, division, college, and campus leadership--who had learned of Plaintiff's concerns regarding gender-based discriminatory actions appropriately referred Plaintiff to Title IX office (September 2014-July 2015).

p)      Based on a comparison of AAU metrics conducted in July 2015, Plaintiff's record of performance is as strong as or stronger than other COE faculty tenured that same month. At that time Plaintiff had more total publications, more publications indexed in World of Science, higher total citations counts, and more awarded external funding than all but one of the six COE faculty who were tenured.

q)      Based on any metric, Plaintiff's record compares positively to recently tenured males and others in the COE who were recently tenured.

r)      Only one of the six junior faculty hired into ESCP at or around Plaintiff's date of appointment (2008-2010) were successfully promoted with tenure. These faculty—5 Tenure-Track faculty & 1 Non-Tenure-Track—are all women and/or people of color.

s)      Six former ESCP faculty were among the 9 "people of color formerly employed by Mizzou" who penned an open letter to MU about how their experiences at MU compelled them to leave. Three of these authors were members of Plaintiff's junior faculty cohort in ESCP (see above).

Electronically Filed - Boone - June 07, 2016 - 02:15 PM

t)      Former ESCP Department Chair and COE Leader submitted a letter for inclusion in Plaintiff's dossier describing the challenging climate of ESCP from 2008 to present.

u)      Defendant Riley-Tillman made numerous comments that contributed to negative departmental culture pertaining to gender. For example, he referred to a top campus-level administrator (who happens to be female) as "that chick" before more than 20 graduate students in ESCP. On another occasion he mocked the sexual harassment training required of all faculty and staff during the 2014-2015 academic year, joking with other white, male colleagues that "that's why they [referencing the female faculty in the room] can say things and we can't."

v)      From April 2014-June 2014, Defendants Riley-Tillman and Herman, with the full knowledge and support of Defendant Martens, intentionally sought biased external reviewers among close friends and colleagues who might negatively evaluate Plaintiff's performance. Provost Stokes would later admit to Plaintiff (during appeal meeting with three other faculty including a MU Curator's Professor) that obtaining qualified and accurate external reviewers was particularly challenging for interdisciplinary scholars such as Plaintiff. She did not elaborate or express further concerns about comments from external reviewers specifically in Plaintiff's case but later identified external reviewer comments as a primary factor in her issuance of a negative P&T recommendation for Plaintiff.  Defendant Loftin (during appeal meeting with three other faculty including full professor/UMC Faculty Council leader on diversity initiatives) revealed identifying information of external reviewers that supports intentional bias in selection of external reviewers by Defendants Riley-Tillman, Herman, and Martens.

w)      Plaintiff submitted her dossier file for Promotion and Tenure to the College of

Education' Dean's office and Provost's office in August of 2014. Although the recommendations within Plaintiff's college were not supportive of her promotion and tenure, the University of Missouri Campus Advisory Committee for Promotion and Tenure (hereinafter "CAS committee") unanimously recommended Plaintiff for promotion and tenure upon appeal. Upon reviewing documents illustrating Plaintiff's record and the two male comparators, CAS committee chair laughed and suggested that "this is pretty self-explanatory."

    x)    By letters dated August 31, 2014 and September 17, 2014, the ESCP Committee (hereinafter "ESCP Committee") voted against Plaintiff's application for Promotion and Tenure. Following the appeal meeting at that level, the Plaintiff requested a written response to 14 points of concern including evidence that Defendant Herman and the ESCP Committee had misrepresented or falsified Plaintiff's record in their review. Defendant Herman responded to only one of those concerns, allowing the falsified record of Plaintiff to inform further stages in the tenure review process. Plaintiff Loftin would later describe his nearly exclusive focus on the negative departmental review Plaintiff received during Plaintiff's appeal meeting with Defendant Loftin. During that meeting, Defendant Lolftin dismissed concerns expressed by Plaintiff's advocate that bias at the departmental review level could negatively affect candidate's entire review process.

    y)    Plaintiff's gender was a contributing factor in Defendant Herman's failure to accurately represent Plaintiff's record which resulted in the ESCP's failure to recommend Plaintiff for promotion andtenure on the basis of her successful fulfillment of all criteria to earn promotion and tenure.

    z)    By letters dated September 18, 2014 and September 29, 2014, Defendants Riley-

Tillman and Martens stated they did not support Plaintiff's application for promotion and tenure.

aa)     Plaintiff's gender was a contributing factor in Defendants Riley-Tillman and Martens failure to recommend Plaintiff for promotion and tenure on the basis of her successful fulfillment of all criteria to earn promotion and tenure.

bb)     A letter submitted by two advocates of the Plaintiff during the tenure review process, Drs. Casandra Harper and Noelle Arnold, describes the disparaging and dismissive nature of comments made to the Plaintiff and about the Plaintiff's record during her appeal meetings with the ESCP Academic Personnel Committee (chaired by Defendant Herman) as well as Defendants Riley-Tillman and Martens.

cc)     By letters dated November 7, 2014 and November 24, 2014, the College of Education Promotion and Tenure Committee stated they did not support Plaintiff's application for promotion and tenure.

dd)     By letters dated December 1, 2014 and December 11, 2014, Defendant Clay stated he did not support Plaintiff's application for promotion and tenure. Plaintiff met with Defendant Clay (with ESCP Senior Faculty/Curator's Professor and former ESCP Department Chair and COE Leader); Defendant Clay reported he wanted to see a "nice, smooth" record of productivity with no acknowledgement of Plaintiff's parental leave and university-approved extension of the probationary period.

ee)     Plaintiff's gender was a contributing factor in Defendant Clay's  failure to recommend Plaintiff for promotion and tenure on the basis of her successful fulfillment of all criteria to earn promotion and tenure.

ff)     The CAS committee is the largest of the three committees serving for the

Promotion and Tenure review process and the only committee that can be considered free of departmental and college biases, that include but are not limited to gender, because its members are elected from across the various campus colleges and departments. This committee's determinations are solely based on a candidate's demonstrated record and are therefore the most objective and important in the review process. The unanimous vote of the CAS Committee in favor of Plaintiff is strong evidence of discrimination across levels of review within the COE.

gg)     By letter dated June 22, 2015, Defendant Stokes notified Plaintiff that she did not support Plaintiff's application for promotion and tenure, in part, by not accepting the positive recommendations of the and CAS committees.

hh)     Plaintiff appealed the decision of Defendant Stokes to Defendant Loftin.

ii)     By letter dated July 14, 2015, Defendant Loftin's response to Plaintiff's request for an explanation as to why he denied her application for promotion and tenure stated that he considers departmental and college guidelines and well as materials presented to him, and thereafter cited to CRR 320:035, to wit: "The University seeks faculty members who are genuinely creative scholars and inspired teachers and who are dedicated to the pursuit of knowledge and its transmission to others.  These high standards are to be observed in the recruitment, promotion, and tenuring of faculty members.  All persons and committees making recommendations regarding promotion and tenure will consider the candidate's demonstrated ability to meet these standards.  Outstanding intellectual qualities as reflected in teaching and scholarship are the primary criteria for recommendation for promotion and tenure."  "Evidence of effective and sustained research and creativity must be presented.  Quantity can be a consideration but quality must be the primary one."  (A copy of said

letter,  attached as page 1 of Exhibit F in the original petition, is incorporated by reference herein.)

jj)      On July 24, 2015, Plaintiff met with Defendant Loftin and raised concerns about the impact her taking parental leave and "stopping the tenure clock" had on her application for promotion and tenure.  His response was that he would deal with the leave by "just ignoring that that year even happened." Plaintiff's advocate—full professor and UMC Faculty Council leader on diversity initiatives—challenged the accuracy of Defendant Loftin's understanding of biological mothers' parental faculty leaves by descrivbing her own experience. Defendant Loftin summarily dismissed these concerns.

kk)      By letter dated July 31, 2015, Plaintiff was informed by Defendant Loftin that he had decided that Plaintiff not be granted promotion and tenure and she would be placed on a terminal year contract for 2015-2016. (A copy of said letter, attached as page 2 of Exhibit G in the original petition, is incorporated by reference herein.)

ll)      In informing Plaintiff that her application for promotion and tenure was denied, Defendant Loftin was acting either individually or in concert with the other named Defendants.

mm)    Plaintiff's gender was a contributing factor when Defendant Loftin, acting either individually or in concert with the other named Defendants, refused to accept the  CAS committee's recommendations, and denied her application for promotion and tenure.

nn)      Upon knowledge and belief, Defendants Clay, Herman, & Martens, had actual or constructive knowledge of the Plaintiff's gender, and male comparator Stephen Whitney's gender (Department of Educational, School, and Counseling Psychology in the College of Education).  Defendant Herman wrote compartor Whitney's unanimous  positive

Electronically Filed - Boone - June 07, 2016 - 02:15 PM

recommendation letter from ESCP Academic Personnel Committee under the same P & T Policy used to review Plaintiff. Defendant Martens was a voting member of ESCP faculty when compartor Whitney was review of P & T.

oo)     Defendant Clay later overturned negative College of Education P&T Committee Vote for comparator Whitney with strong positive recommendation of comparator Whitney for promotion and tenure.

pp)     Plaintiff's performance in research, teaching and service is superior to that of the male colleague (i.e. sex comparator: Whitney) who was recommended for and awarded tenure and promotion to the rank of Associate Professor.

qq)     Upon knowledge and belief, Defendant Clay had actual or constructive knowledge of the Plaintiff's gender, and male comparator Bradley Curs' gender (Department of Educational Leadership and Policy in the College of Education). Defendant Clay minimized comparator Curs' negative external review letters during review process. Defendant Clay would later emphasize possibly negative comments explicated in Plaintiff's external review letters.

rr)     Plaintiff's performance in research, teaching and service is superior to that of the male colleague (i.e. sex comparator: Curs) who was recommended for and awarded tenure and promotion to the rank of Associate Professor.

62.     As a result of Defendants' conduct and adverse employment action in violation of MHRA on the basis of sex (i.e. gender, pregnancy and childbirth), Plaintiff was damaged.

63.     Defendants' conduct and adverse employment actions in violation of MHRA caused Plaintiff continued and intense emotional distress.

64.     Defendants' conduct and adverse employment action in violation of MHRA were outrageous because of Defendants' evil motive or reckless indifference to the rights of others, entitling Plaintiff to an award of punitive damages in addition to her actual damages.

**WHEREFORE**, Plaintiff Melissa A. Maras respectfully prays for the following relief:

1.     That the Court declares that the conduct Plaintiff complains of herein violates the MHRA;

2.     That Plaintiff be awarded back pay from the date of termination until the date of judgment, including prejudgment interest, and reimbursement for any and all out-of-pocket incidental expenses.  Plaintiff also prays for the value of lost vacation time, lost sick leave time, retirement, and any other appropriate relief necessary to make Plaintiff whole and compensate her for the civil rights violations described above in an amount not less than $250,000.00;

3.     That Plaintiff be awarded punitive damages against Defendants for violation of the MHRA, and for humiliation and emotional distress in that Defendant's unlawful actions caused damage to her health by way of causing her to experience medical problems including but not limited, depression, insomnia, irritability, loss of self confidence, loss of feelings of self worth, and a negative state of mind including a sense of angry indignation in an amount not less than $5,000,000.00;

4.     A permanent injunction ordering Defendants to cease and desist from all acts of discrimination and harassment, and retaliation against anyone in its employ on the basis of sex;

5.     That Defendant Curators develop, implement, and enforce a remediation

program consistent with state and federal law to ensure that all female employees

are treated equally and without regard to their gender;

6.    That Plaintiff is reinstated with promotion to associate professor and tenure;

7.    That Plaintiff be awarded her reasonable attorney's fees and costs;

8.    That Plaintiff be awarded such other legal and equitable relief as this Court

deems just and proper.

## COUNT II: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (as to Defendant Curators)

65.    Plaintiff hereby re-alleges and repeats paragraphs 1 through 54 and 61, and

incorporates them herein as if fully set forth.

66.    Plaintiff's employment as a tenure-track faculty member with a regular

appointment is an enforceable contract.   The terms of said as contained in the appointment

letter stated, inter alia, "that her appointment will be subject to all rules, orders and regulations

of the Board of Curators, including the Academic Tenure Regulations ...." (A copy of Plaintiff's

appointment letter, labeled as Exhibit A, and a copy of CRR 320.035, CRR 370.010.B & C,

CRR 320.010(A), CRR 310.015, CRR 310.020, CRR 310.025, the ESCP criteria and standards

for appointment to Associate Professor, and the AAUP's Recommended Institutional

Regulations on Academic Freedom and Tenure, labelled as Exhibit H, I , J, K, L, M, N and O

,respectively, and attached to the original petition, are hereby attached and incorporated by

reference.  The Provost's guidelines for Promotion and Tenure are located at

http://provost.missouri.edu/promotion-and-tenure/index.php, and is incorporated by reference

into this petition.)

67.    As a result of the employer-employee relationship between Plaintiff and

Defendant Curators, the terms of Plaintiff employment contract with Defendant Curators, and

Electronically Filed - Boone - June 07, 2016 - 02:15 PM

the expressed and implied promises made in connection with said employment contract and decisions, and the acts, conduct and communications resulting in said promises, Defendant Curators promised to act in good faith toward and deal fairly with Plaintiff, which requires, among other things, that:

a.      Each party act in good faith toward the other concerning all matters associated with the terms of Plaintiff's contract as a tenure-track professor and the recommendations and decisions in Plaintiff's application for promotion and tenure;

b.      The decisions and acts of the defendants, as alleged in paragraph 61, wherein her gender (i.e. gender, pregnancy, childbirth) was a contributing factor in the denial of a recommendation or decision for promotion and tenure, were failures to act in good faith towards Plaintiff;

c.      The decisions and acts of the defendants, as alleged in paragraphs 1-54 and 61, wherein Plaintiff exceeded all expectations and standards for research performance, were failures to act in good faith towards Plaintiff;.

d.      Each party act in fairness toward the other concerning all matters associated with the terms of Plaintiff's contract as a tenure-track professor and the recommendations and decisions in Plaintiff's application for promotion and tenure;

e.      The decisions and acts of the defendants, as alleged in paragraph 61, wherein her gender (i.e. gender, pregnancy, childbirth) was a contributing factor in the denial of a recommendation or decision for promotion and tenure, were failures to act in fairness towards Plaintiff;

f.      The decisions and acts of the defendants, as alleged in paragraphs 1-54 and 61, wherein Plaintiff exceeded all expectations and standards for research performance,

were failures to act in fairness towards Plaintiff;

g.      The decisions and acts of the defendants, as alleged in paragraph 61, wherein her gender (i.e. gender, pregnancy, childbirth) was a contributing factor in the denial of a recommendation or decision for promotion and tenure when her performance to male comparators Curs and Whitney was superior were failures to act in good faith or fairness towards Plaintiff;

h.      Each party would comply with its representations and promises concerning all matters associated with the terms of Plaintiff's contract as a tenure-track professor and the recommendations and decisions in Plaintiff's application for promotion and tenure;

i.      The decisions and acts of the defendants, as alleged in paragraph 61, wherein her gender (i.e. gender, pregnancy, childbirth) was a contributing factor in the denial of a recommendation or decision for promotion and tenure, and when her performance to male comparators Curs and Whitney was superior to them, were failures to comply with the representations and promises to not discriminate on the basis of gender, and were failures to comply with the promotion and tenure regulations and the Collected Rules and Regulations by applying the same standards of performance to Plaintiff as to male comparators;

j.      The decisions and acts of the defendants, as alleged in paragraphs 1-54 and 61, wherein Plaintiff exceeded all expectations and standards for research performance, were failures to comply with its representations and promises concerning all matters associated with the terms of Plaintiff's contract as a tenure-track professor and the recommendations and decisions in Plaintiff's application for promotion and tenure;

k.      Defendant Curators would give Plaintiff's interests the same consideration it

gives its own; and

l.      The decisions and acts of the defendants, as alleged in paragraphs 1-54 and 61, wherein Plaintiff exceeded all expectations and standards for research performance were failures of the University to give Plaintiff's interests the same consideration it had given comparators Curs and Whitney.

68.      Defendant Curators' refusal to perform under the terms of Plaintiff's contract, Plaintiff's application for promotion and tenure and the Department Chair's, Dean's, Provost's and Chancellor's recommendations and decisions was wrongful, in bad faith, and in violation of its duties to evaluate Plaintiff's performance without regard to her gender and using the same standards and criteria as it applied to male comparators.

69.      Defendant Curators' breach of the covenant of good faith and fair dealing caused Plaintiff to suffer damages and injury.

70.      As a direct result and proximate cause of Defendant Curators' breach of the covenant of good faith and fair dealing, Plaintiff suffered reputational harm and inadequate salary compensation and increases, in an amount yet to be determined, but in excess of five hundred thousand dollars ($500,000.00).

## COUNT III: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. §§2000e et seq.
**(as to Defendant Curators)**

COMES NOW Plaintiff and for Count III of her cause of action states as follows:

71.      Plaintiff re-alleges and repeats the allegations set forth in paragraphs 1 to 54, and 61 and 66, and incorporates them herein as if fully set forth.

72.      At all times relevant to the allegations contained herein, Defendant Curators subjected Plaintiff to a hostile work environment and gender-based discrimination.  Plaintiff's

gender was a motivating or determining factor in the Defendant taking these adverse employment actions against Plaintiff.

WHEREFORE Plaintiff respectfully prays that the Court:

a. Grant judgment against Defendant Curators for such equitable and other relief for violation of Plaintiff's civil rights as provided by 42 U.S.C. §§2000e-5(g) which includes Plaintiff's actual costs and lost wages and retirement, loss of professional reputation, and such other and further relief as the Court deems just and proper.

b. Grant to Plaintiff an award of her costs of litigation, including reasonable attorney's fees and reasonable expenses;

c. Grant to Plaintiff an award of punitive damages in the amount listed in Count I;

d. Issue a permanent injunction ordering Defendant Curators to cease and desist from all acts of discrimination and harassment against anyone in its employ on the basis of gender;

f. Order Defendant Curators to develop, implement and enforce a remediation program consistent with state and federal law to ensure that all female employees are treated without regard to gender; and

g. Grant such other and further relief as this Court deems just and proper in the premises.

Respectfully Submitted,
JOHNSTON & SMITH, LLC

__/s/ George S. Smith____
George S. Smith, #53019
2800 Forum Blvd., Ste. 3
Columbia, MO 65203
(573) 499-1616
(573) 449-3004 (fax)
Attorney for Plaintiff

Electronically Filed - Boone - June 07, 2016 - 02:15 PM



U.S. Department of Justice
Civil Rights Division



CERTIFIED MAIL
7010 0290 0000 2017 1701

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

May 13, 2016

Ms. Melissa A. Maras
c/o George Smith, Esquire
Law Offices of Johnston & Smith
2800 Forum Blvd.
Suite 3
Columbia, MO 65203

Re: EEOC Charge Against The Curators of University of Missouri, et al.
    No. 28E201600394

Dear Ms. Maras:

Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC St. Louis District Office, St Louis, MO.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                          Sincerely,

                          Vanita Gupta
                          Principal Deputy Assistant Attorney General
                          Civil Rights Division

                    by   *Karen L. Ferguson*
                          Karen L. Ferguson
                          Supervisory Civil Rights Analyst
                          Employment Litigation Section

cc: St. Louis District Office, EEOC
    The Curators of University of Missouri, et al.