United States Court of Appeals
For the Eighth Circuit
_____

No. 19-2875
_____

Melissa A. Maras

*Plaintiff - Appellant*

v.

The Curators of the University of Missouri; Daniel L. Clay, in his individual and official capacity; Keith Herman, in his individual and official capacity; Matthew P. Martens, in his individual and official capacity; Timothy C. Riley-Tillman, in his individual and official capacity; R. Bowen Loftin, in his individual and official capacity

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City
_____

Submitted: November 18, 2020
Filed: December 29, 2020
_____

Before COLLOTON, ARNOLD, and KELLY, Circuit Judges.
_____

ARNOLD, Circuit Judge.

When Melissa Maras's application for tenure as an associate professor at the University of Missouri was denied, she sued the university's curators (the corporate body that operates the university) and five participants in the tenure-review process,

claiming they had discriminated against her on the basis of sex, in violation of the Missouri Human Rights Act. *See* Mo. Rev. Stat. § 213.055.1(1)(a). She also complained that the curators violated Title VII by discriminating against her because of her sex and violated the implied covenants of good faith and fair dealing in her employment contract. In an admirably thorough opinion, the district court[1] granted the defendants summary judgment on Maras's claims, and she appeals. Reviewing the summary-judgment determination de novo, *see Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1062 (8th Cir. 2020), we affirm.

Some years ago, the university's College of Education hired Maras as a tenure-track assistant professor in its Department of Educational, School and Counseling Psychology. Under the university's regulations, tenure-track assistant professors like Maras would be employed year-to-year during a probationary period that usually lasted six years. In the ordinary course, the professor would apply to be an associate professor with tenure in the final year of the probationary period. If the university declined to grant tenure, the professor would receive a one-year terminal appointment.

The university's regulations emphasized the importance of an applicant's scholarship: "Productivity in research and other scholarly activities is the most distinguishing characteristic of the faculty of the University . . . . Recommendations for promotion or tenure involving cases in which such activities are not at the highest level will be approved only in very rare cases where the documented evidence for teaching (including extension) and/or service contributions is exceptionally compelling." Guidelines specific to Maras's department similarly provided that an applicant for tenure must have "begun to establish a national reputation as a scholar"

---

[1]The Honorable Douglas Harpool, United States District Judge for the Western District of Missouri.

-2-

Case 2:16-cv-04210-MDH   Document 133-1   Filed 12/29/20   Page 2 of 9
Appellate Case: 19-2875   Page: 2   Date Filed: 12/29/2020 Entry ID: 4989007

by publishing ten to twelve "high quality publications" in "high quality, refereed professional journals" or by writing books or textbooks, among other things. These publications, the criteria said, must "establish an empirical and programmatic line of research." Finally, the department-specific guidelines emphasized that "[c]andidates must show scholarly leadership through first authorship in at least some instances."

In the third, fourth, fifth, and sixth years of her probationary period, Maras received written annual reviews from a department academic personnel committee that discussed her progress in satisfying the tenure standards. Between five and fifteen members of this committee participated in each of the annual reviews. In some years she also received reviews from her department chair or department administrator. The overall tenor of these reviews was that Maras needed to improve her scholarship in three ways—by publishing in better journals, by publishing more as first author, and by publishing more writings that were empirical rather than theoretical. Though some performance reviews indicated that Maras improved her scholarly output as the tenure-application date neared, her reviewers nonetheless expressed concerns about her scholarship up to the very year of her tenure application.

As for the tenure application, the district court correctly explained that the "primary source of information for reviewing candidates for promotion and tenure is the candidate's dossier." That dossier includes, among other things, the applicant's curriculum vitae and information about the applicant's teaching history, research accomplishments, role in obtaining grants, and service contributions. Importantly, the dossier also includes six to eight letters from reviewers outside the university who could review the applicant's work objectively.

The six external reviews of Maras's tenure application might best be described as mixed. Some reviewers spoke well of Maras and her fitness for tenure. Others, while generally making statements favorable to Maras's application, offered some

-3-

Case 2:16-cv-04210-MDH   Document 133-1   Filed 12/29/20   Page 3 of 9
Appellate Case: 19-2875     Page: 3     Date Filed: 12/29/2020 Entry ID: 4989007

remarks that might give a decisionmaker pause. For example, one reviewer said that Maras would "likely" be granted tenure at the reviewer's university even though Maras's "case is somewhat marginal." Another acknowledged that Maras would probably not be granted tenure at his university even though she should be. A different reviewer lauded Maras's record of service and "record of secondary publications" but noted "relative weaknesses" in her other scholarship, including "a publication rate on the lower end of the acceptable range for a research institution, lack of first authored publications, lack of external federal funding, and publications with conceptual, but not methodological, sophistication." As a result, the reviewer explained, the weakness of Maras's research record "would likely make her case marginal for promotion and tenure" at that reviewer's university. Finally, one reviewer stated outright that Maras's scholarship was insufficient because "the number of peer-reviewed publications is lower than set forth in the department guidelines," "across all publications, only one reports the results of empirical research," and "the data suggest a decreasing trend in Dr. Maras'[s] publication rate over the past three years." That reviewer summarized her opinion by stating that Maras's scholarship record "would deem her potentially ineligible for promotion and tenure at other research-intensive universities I am familiar with."

The record shows that the university's tenure-review process is elaborate and painstaking. It proceeds in numerous stages until it ultimately reaches the desk of the university's chancellor, who was defendant R. Bowen Loftin at the time Maras applied for tenure. The chancellor is the final decisionmaker and is not bound by the recommendations of others. Along each step of the way, however, the relevant person or committee reviewing the candidate's application would make a written recommendation, which would then be included in the candidate's dossier and available for review by those later involved. At each step, if a recommendation was negative, the candidate was given an opportunity to request reconsideration and submit a written rebuttal that would be included in the dossier.

-4-

Case 2:16-cv-04210-MDH   Document 133-1   Filed 12/29/20   Page 4 of 9
Appellate Case: 19-2875      Page: 4      Date Filed: 12/29/2020 Entry ID: 4989007

Maras's first review came from her department's academic personnel committee, which defendant Keith Herman chaired. Herman had also been a member of or chaired the committee when it gave Maras her annual performance reviews. By vote of seven to three, the committee recommended against tenure. Maras provided information to rebut the committee's written explanation, and after an in-person hearing, the committee voted six to three to uphold its initial recommendation. Herman voted against tenure both times.

Defendant Matthew Martens, the college's Division Executive Director, and defendant Christopher Riley-Tillman, the college's Associate Division Director, then considered Maras's application. Both recommended denying her tenure, and Maras provided information to rebut their recommendations. Maras received a hearing, but neither of them changed his mind. Recall that these decisions and appeals are accompanied by written arguments and explanations that are included in Maras's dossier for review by people further along in the process.

The next stop along the way was a review by a five-member committee representing each of the college's five departments. A female professor, who is not a defendant here, represented Maras's department. That committee unanimously recommended against tenure, both before and after Maras asked it to reconsider. Defendant Dan Clay, the college dean, was then asked to make a recommendation. As had happened at every previous step, Maras received an initial negative recommendation, and she requested reconsideration. As before, she offered rebuttal information and appeared in person for a hearing. But once again, the initial recommendation remained undisturbed.

Maras's application then passed on to a campus-wide committee composed of tenured faculty members from different colleges and schools of the university. That committee initially voted nine to two against tenure. This time, though, when Maras provided rebuttal materials and appeared at a hearing, she obtained a favorable

-5-

result—the committee reversed its initial stand and came down on her side by a vote of ten to zero.

The provost, who is not a defendant here, then reviewed Maras's application. He recommended that Maras not be granted tenure, largely because of "concerns" about her research. Though Maras asked for reconsideration, provided rebuttal information, and appeared before the provost in person for a hearing, he left his recommendation unchanged. When Maras's case reached Chancellor Loftin—the ultimate decisionmaker—he met twice with the provost to discuss the matter. Loftin's initial determination, just like everyone else's, was against tenure. Maras appealed, provided rebuttal information, and met with Loftin in person. But he declined to reverse his decision.

We begin with Maras's Title VII claim. Title VII prohibits employers from discriminating against employees because of their sex. *See* 42 U.S.C. § 2000e-2(a)(1). Without direct evidence of discrimination, plaintiffs must make a prima facie case of sex discrimination, and if they do, the employer must offer legitimate, non-discriminatory reasons for the actions taken. If the employer provides such reasons, the employee must demonstrate that the given reasons are pretext for unlawful discrimination. *See Gibson*, 960 F.3d at 1062. We take up this appeal at the pretext stage, as the university has offered a legitimate, non-discriminatory reason for denying Maras tenure, namely, shortcomings in her scholarship record.

Courts have recognized that the nature of tenure decisions makes it difficult for Title VII plaintiffs to succeed as a practical matter. Tenure decisions turn on uniquely "specialized, multi-factored judgments" involving "numerous decisionmakers," *see Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859, 865 (D.C. Cir. 2019), and they involve a foreseeable, deliberate employment decision that is not prompted by accusations of malfeasance or nonfeasance. We have said, moreover, that when a tenure candidate points to her scholarship record to show that she is qualified for

Case 2:16-cv-04210-MDH   Document 133-1   Filed 12/29/20   Page 6 of 9
Appellate Case: 19-2875     Page: 6      Date Filed: 12/29/2020 Entry ID: 4989007

tenure, a university's conclusion to the contrary must be "obviously unsupported." *See Qamhiyah v. Iowa St. Univ. of Sci. & Tech.*, 566 F.3d 733, 747 (8th Cir. 2009). The strength of a tenure candidate's scholarship record, and its overall fit in a department's or university's educational regime, is quintessentially the type of academic decision that courts should respect. *See Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005).

Maras argues here that her scholarship record was sufficient for tenure and that the university thus must be trying to hide discriminatory animus. But we can't say the university's decision was obviously unsupported. Numerous people over four years expressed concerns about Maras's record of scholarship in relation to her upcoming tenure application. Many throughout the application process, including people outside the university, expressed similar concerns. A widely shared opinion like this, consistent over a significant period of time, strongly supports the university's proffered reason for tenure denial. *See Qamhiyah*, 566 F.3d at 745, 747. It's difficult to believe that dozens of people, both men and women (many of whom Maras does not accuse of discrimination), who gave written reasons for their recommendations for others to see and then stood by them when Maras challenged them, all harbored sex-based discriminatory animus against her.

Maras nonetheless identifies three male comparators who received tenure despite, she argues, having scholarly records that were no better than hers. But for us to draw inferences of pretext based on this type of evidence, comparators must be "similarly situated in all relevant respects" to the plaintiff, *see McGhee v. Schreiber Foods, Inc.*, 502 S.W.3d 658, 667 (Mo. Ct. App. 2016), a "test" we have described as "rigorous." *See Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019). This is perhaps especially true in the tenure context where disparate treatment could be due to a host of reasons other than unlawful discrimination. *See Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984).

-7-

Case 2:16-cv-04210-MDH   Document 133-1   Filed 12/29/20   Page 7 of 9
Appellate Case: 19-2875     Page: 7     Date Filed: 12/29/2020 Entry ID: 4989007

In any case, the comparators Maras points to are not similarly situated in all relevant respects to Maras. The ultimate decisionmaker, Chancellor Loftin, did not review any of the comparators' applications. One comparator was in a completely different department. Each of them also had several positive recommendations at many steps in the tenure process, while Maras did not. And it's not obvious to us that their records of scholarship were no better than Maras's. As the district court explained, Maras has not shown "that the other candidates had the same quality of publications, the same recommendations from each committee level, or the same outside evaluations."

The district court offered a few statistics that buttress our conclusion. For example, Loftin reviewed about seventy tenure applications while he was chancellor, about half of them from men and half from women. He denied six—four men and two women, one of whom was Maras. Clay reviewed eighteen tenure applications from assistant professors, twelve of them from women. He made only two negative recommendations—one for Maras, and one for a man. The other defendants consistently recommended women for tenure or promotion as well. Though broad statistics like these do not necessarily foreclose the possibility of a particular instance of discrimination, when coupled with the other evidence in this record, they lend support to the conclusion that no reasonable factfinder could think Maras's gender had anything to do with the university's denial of tenure.

In sum, Maras has not shown "that the circumstances permit a reasonable inference of discriminatory animus." *See Qamhiyah*, 566 F.3d at 747. While the university's decision could have been wrong—a point on which we necessarily express no opinion—there is nothing here to indicate that it was based on Maras's sex in any way. We therefore affirm the court's grant of summary judgment on Maras's Title VII claim. Her related MHRA claim fares no better because, as we just explained, no reasonable factfinder could conclude that Maras's sex contributed at all to the university's decision, as the MHRA requires for a plaintiff to succeed. *See Denn*

-8-

Case 2:16-cv-04210-MDH   Document 133-1   Filed 12/29/20   Page 8 of 9
Appellate Case: 19-2875   Page: 8   Date Filed: 12/29/2020 Entry ID: 4989007

*v. CSL Plasma, Inc.*, 816 F.3d 1027, 1032 (8th Cir. 2016). And since Maras based her contract claim on the curators' alleged sex discrimination, we affirm the court's grant of summary judgment on that claim as well.

Affirmed.

_____

-9-

Case 2:16-cv-04210-MDH   Document 133-1   Filed 12/29/20   Page 9 of 9
Appellate Case: 19-2875   Page: 9   Date Filed: 12/29/2020 Entry ID: 4989007